

# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS ESPINOZA,<br><br>Defendant. | 3:15-CR-30077-RAL<br><br>REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE AND STATEMENTS |

In this domestic assault case, Thomas Espinoza seeks to suppress, on Fourth Amendment grounds and under *Miranda*,[1] the statements he made to tribal officers before and after he was arrested and the folding knife that was seized from his person incident to the arrest. Because some of this evidence (the pre-arrest statements and the knife) is excludable as fruits garnered from a poisonous tree and some (the post-arrest statements) is not, the Court recommends that Espinoza's suppression motion be granted in part and denied in part.

## BACKGROUND

Just after midnight on June 7, 2015, Earlene Peneaux called the Rosebud Sioux Tribe Police Department and reported that her boyfriend was trying to kill her at

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Sunrise Apartment Number 904 in Mission, South Dakota. Carl Hunger, a tribal police officer, and Mission City Officer Louis Young, both responded to the call. As he was getting out of his patrol car, Officer Hunger witnessed Peneaux running out of the apartment fanatically yelling "psycho." He asked her what happened and if the "male" was still inside, but she did not answer either question. From his vantage point, he could see Espinoza, who he had arrested before, in an upstairs window of the apartment.

Without consent or a warrant, Officer Hunger entered the open front door and made contact with Espinoza in the bedroom that faced the parking lot. The officer immediately noticed several bleeding scratch marks on Espinoza's face and inquired about what had happened. Espinoza reported that he had "got into it" with Peneaux and that she had "attacked" him. He also showed the officer the marks on his arm where he maintained Peneaux had bit him. During these interactions, the officer detected an odor of alcohol coming from Espinoza's breath and observed alcoholic beverage containers in the bedroom.

At some point, while Officer Hunger was still with Espinoza, Officer Young walked into the apartment and stood in the doorway of the bedroom. Soon thereafter, Peneaux entered as well and tried to force her way into the bedroom, shouting things at Espinoza. Officer Hunger handcuffed and arrested Peneaux (for disorderly conduct), escorted her out of the apartment and told Officer Young to remain with Espinoza.

Officer Hunger talked to Peneaux about the incident beside his patrol car and obtained a statement from her. He also saw, with the aid of his flashlight, that she had sustained injuries to her neck (he thought were consistent with strangulation) and had marks on her face (he believed were caused by being struck with a hand or fist).

Convinced that Peneaux had been the victim of the affray and that he now had probable cause, Officer Hunger went back into the apartment and placed Espinoza under arrest (for the tribal offense of domestic violence) and performed a search of his person, incident to the arrest. During the search, the officer found a folding knife in one of Espinoza's pants pockets. At Espinoza's request, the officer took photographs of Espinoza's injuries, including the scratches on his face, the bite mark on his arm and the abrasion on his elbow. Espinoza was then transported to the Rosebud jail where he was incarcerated.

The next day, approximately 32 hours later, Rosebud Sioux Tribe Special Agent Robert Sedlmajer interviewed Espinoza at the tribal jail where he was being housed. Espinoza was advised of his *Miranda* warnings and signed a written waiver of them, agreeing to answer questions without a lawyer present and talk to the agent about his encounter with Peneaux. While being interrogated, Espinoza made statements implicating himself in the scuffle.

Afterward, a federal grand jury indicted Espinoza for feloniously assaulting Peneaux by strangulation and suffocation. He moved to suppress the knife and his statements to Officer Hunger and Agent Sedlmajer. The Government filed a response

to the motion, resisting the same.  On October 29, 2015, an evidentiary hearing was held at which two witnesses testified and three exhibits were received into evidence.

## DISCUSSION

### A. Entry and Arrest

Espinoza first claims that the warrantless and non-consensual entry into the apartment and arrest of him inside ran afoul of the Fourth Amendment.  Because he was a resident and any exigency had dissipated, he says, tribal officers were required, but failed to obtain, a warrant before entering and arresting him.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2] Physical entry of the home is "the chief evil" against which the wording of this Amendment is directed.[3]  For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable."[4]  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness' the warrant requirement is

---

[2]U.S. Const. amend. IV.

[3]*United States v. United States District Court*, 407 U.S. 297, 313 (1972).

[4]*Payton v. New* York, 445 U.S. 573, 586 & n.25 (1980).

4

subject to certain exceptions."[5]  One exception is when "the exigencies of the situation"
make an immediate and warrantless entry into a residence "objectively reasonable."[6]

There are several exigencies that may justify the warrantless entry into a home.[7]
Under the "emergency aid" exception, for example, police "officers may enter a home
without a warrant to render emergency assistance to an injured occupant or to protect
an occupant from imminent injury."[8]  Officers may also enter a residence without a
warrant when they are in "'hot pursuit' of a fleeing suspect."[9]  And the need "to
prevent the imminent destruction of evidence" has long been recognized as a sufficient
justification for a warrantless search.[10]

"The analysis of whether the exigent circumstance exception to the warrant
requirement has been made out is an objective one focusing on what a reasonable,

---

[5]*Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Katz v. United States*, 389 U.S. 347, 357 (1967).

[6]*Brigham City*, 547 U.S. at 403 (*quoting Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)).

[7]*See Brigham City*, 547 U.S. at 403.

[8]*Id.* (*citing Mincey*, 437 U.S. at 392); *see also Michigan v. Fisher*, 558 U.S. 45, 48-49 (2009) (upholding a warrantless home entry based on the emergency aid exception).

[9]*United States v. Santana*, 427 U.S. 38, 42-43 (1976).

[10]*Brigham City*, 547 U.S. at 403 (*citing Ker v. California*, 374 U.S. 23, 40 (1963) (*plurality opinion*)); *Georgia v. Randolph*, 547 U.S. 103, 116 n.6 (2006); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).

experienced police officer would believe."[11]  "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."[12]

Officers may enter a home, without a warrant, "to protect a resident from domestic violence. . . ."[13] They may likewise make a warrantless entry "to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur . . . ."[14] Even so, the fact that a domestic violence incident occurred is not, in and of itself, enough to support the warrantless entry and arrest of a suspect in his home. This is because "not all domestic violence situations create exigent circumstances."[15]

---

[11]*United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012); *see also Fisher*, 558 U.S. at 47 (this exception requires "an objectively reasonable basis for believing that a person within the house is in immediate aid"); *Brigham City*, 547 U.S. at 404 ("an action is 'reasonable' under the Fourth Amendment regardless of the individual officer's state of mind, as long as his circumstances, viewed objectively, justify the action").

[12]*Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

[13]*Randolph*, 547 U.S. at 118.

[14]*Id.*

[15]*United States v. LaDeaux*, CR. 11-50128-JLV, 2012 WL 1609913 at *3 (D.S.D. May 8, 2012); *see also Smith v. Kansas City, Missouri Police Dept.*, 586 F.3d 576, 580 (8th Cir. 2009) (the presence of a domestic violence suspect does not alone justify a police officer's warrantless entry into a home); *United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002) (rejecting blanket rule that domestic violence calls are always dangerous and give police officers "unfettered permission" to enter homes).

Still, courts accord an officer great latitude when he has substantial reason to believe that one of the parties to a dispute is in danger.[16] But if there is no apparent danger present or urgent need to act, then a warrant must be procured before entering a dwelling place, absent consent.[17]

Here, Peneaux, the alleged victim, was in no immediate danger when Officers Hunger and Young arrived. In fact, she was safely outside the apartment building and with the officers.[18]

There is no evidence that anyone other than Peneaux and Espinoza lived or was present in the apartment that night. Peneaux did not mention, in either her 911 call or at the scene, anyone else being in the apartment. Nor did she identify any other person involved in the dispute or express fear for the safety of any third parties.

Upon the officers' arrival, there was no evidence of any disturbance inside or outside of the apartment. Significantly, Officer Hunger recognized Peneaux as she ran out of the apartment building. Had he not done so, it may have been reasonable for

---

[16]*See United States v. Lawrence*, 236 F.Supp.2d 953, 962 (D. Neb. 2002) (collecting cases).

[17]*See Steagald v. United States*, 451 U.S. 204, 211-16 (1981); *Mincey*, 437 U.S. at 392-95; *Smith*, 586 F.3d at 581; *United States v. Lakoskey*, 462 F.3d 965, 973-74 (8th Cir. 2006), *cert. denied*, 549 U.S. 1259 (2007); *see also United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1027-29 (8th Cir. 2007) (officers made a warrantless home entry to address a husband who was unsettled about the disintegration of his marriage and was holed up in a locked bedroom with a gun).

[18]*See Smith*, 586 F.3d at 579.

7

him to be concerned about Peneaux and enter the apartment to ensure her safety. And had he heard signs of a struggle or commotion still within the apartment, the officer may have been justified in entering based on the reasonable belief that another potential victim was present or that Peneaux was in need of aid.[19] But the facts reflect that Peneaux was the only possible victim or person in danger and that she was no longer in harm's way at the time the officers were getting out of their patrol cars.[20]

Similarly, a reasonable officer in the officers' position would not have had a legitimate concern for Espinoza's safety. There was no indication he was injured or was a threat to himself.[21] Although Peneaux referred to Espinoza as a "psycho," nothing he did or said gave the officers a reasonable basis to conclude that they could enter the

---

[19]See *United States v. Martinez*, 406 F.3d 1160, 1164-65 (9th Cir. 2005) (although exigent circumstances were not present because the domestic assault victim was outside the residence, emergency exception to the warrant requirement applied because police still heard angry yelling from inside the residence and needed to enter it to render emergency aid).

[20]See *Smith*, 586 F.3d at 579-80; *see also United States v. Lopez*, No. 2:08-CR-94, 2009 WL 982777 at *4 (E.D. Tenn. April 13, 2009) (collecting cases and noting courts have held, almost uniformly, that "once a victim of domestic violence is removed from the situation, the exigency required to justify a warrantless entry is also removed").

[21]See *Uscanga-Ramirez*, 475 F.3d at 1029 (finding there were exigent circumstances present based on statements from suspect's wife that he locked himself in a bedroom with a gun and was very upset); *see also Fisher*, 558 U.S. at 45-48 (where police officers were directed to a certain address by people who said a man was "going crazy" and found a pickup in the driveway with its front smashed, three broken house windows, blood on the hood of the pickup and clothes inside of it and on a door to the house, and through a window could see a man screaming and throwing things, officers could reasonably believe that the man "would hurt himself in the course of his rage").

apartment without a warrant because he was in need of either emergency assistance or protection from imminent harm.[22]

There also was no need to enter the apartment for officer safety reasons because of Espinoza's use of a firearm or other weapon. The officers had no information that Espinoza owned a firearm or had one with him or in the apartment or that he had or would use such a weapon against anyone, including law enforcement.[23] No shots were heard or reported and the officers did not see Espinoza with a gun or know of one anywhere in the apartment. Importantly, Officer Hunger did not observe any wounds, blood, marks or signs that Peneaux had been injured before he initially entered. While Espinoza did have a folding knife in his pocket, the officers had no intelligence that this instrument had been used in the reported incident or, until the arrest, that he even had a knife on his person.

If there was any danger to the officers, it was of their own doing. Had they secured Peneaux after she fled the apartment, the officers could have determined if (1) she was hurt and in need of medical assistance, (2) there was anyone else in the apartment, (3) Espinoza had a firearm or there was one inside with him and (4) he was a

---

[22]See and compare with *Brigham City*, 547 U.S. at 403.

[23]See *Smith*, 586 F.3d at 580, see also *United States v. Church*, No. 1:06:CR:292, 2007 WL 689890 at *2 (W.D. Mich. Mar. 2, 2007) (observing that "[t]he presence of a weapon creates an exigent circumstance, provided the government is able to prove [it] possessed information that the suspect was armed and likely to use [the] weapon or become violent").

risk of harming himself.   Instead, Officer Hunger rushed into the apartment on unsupported assumptions.

A reasonable officer in Officers Hunger and Young's position, with the sketchy information they had, would not have believed he or others were in any immediate danger.   Peneaux had distanced herself from Espinoza and was no longer in peril.   And no one else, either in or outside the apartment, was in jeopardy.   The circumstances thus did not suggest that any serious consequences would have occurred had the officers first tried to obtain consent[24] or an arrest warrant.[25]   On this record, the Court is unable to find the requisite exigent circumstances to justify the warrantless entry into and arrest of Espinoza in the apartment.[26]

The Court does not discount the "combustible nature" of domestic violence situations.   It fully understands and appreciates the dangers police officers face each day when they are called upon to quell a domestic disturbance.   But the protection

---

[24]*See and compare with United States v. Aquallo*, No. 3:14-CR-30051-RAL, 2014 WL 6812383 at *3 (D.S.D. Nov. 26, 2014) (where consent given to enter residence that had "a lot of" firearms inside and officers feared "an unpredictable" situation and wanted to avoid a "violent outcome" and something "bad" happening).

[25]*See Missouri v. McNeely*, 133 S.Ct. 1552, 1561-62 (2013) (pointing out that technology now "allow[s] for more expeditious processing of warrant applications" and that "telecommunications innovations" have enable jurisdictions to "streamline the warrant process").

[26]*See Olson*, 495 U.S. at 100; *Smith*, 586 F.3d at 579-80; *LaDeaux*, 2012 WL 1609913 at **3-5; *Lopez*, 2009 WL 982777 at **4-5.

against officers entering a person's home to effect a warrantless arrest or search, absent exigent circumstances, is a fundamental one that must be safeguarded and adhered to.

Despite the good intentions of the officers, the Court reluctantly concludes that the warrantless entry and arrest of Espinoza in his apartment violated the Fourth Amendment.[27] This being the case, the question then becomes whether Espinoza's pre- and post-arrest statements and the knife seized from him should be suppressed as the tainted fruit of a poisonous tree or otherwise.[28]

## B. Pre-Arrest Statements

Espinoza claims that his pre-arrest statements should be suppressed as the fruit of an unlawful Fourth Amendment entry into and search of the apartment and under *Miranda*. The Government maintains that his statements are not the poisonous harvest of a constitutional violation but does not address the *Miranda* claim.

---

[27]*See Smith*, 586 F.3d at 579-80; *United States v. Nora*, 765 F.3d 1049, 1054-55 (9th Cir. 2014); *LaDeaux*, 2012 WL 1609913 at **5-6; *Lopez*, 2009 WL 982777 at *5; *see also United States v. Stoneman*, CR. 09-30101-RAL, 2010 WL 1610065 at **1-3 (D.S.D. April 20, 2010) (suspect's warrantless tribal arrest, without consent, in the home of his live-in girlfriend, violated *Payton* and the Fourth Amendment); *Zitterkopf v. Hanks*, No. 7:08CR3190, 2010 WL 1287076 at **5-7 (D. Neb. Mar. 30, 2010) (officer's entry into home, without a warrant, consent or exigent circumstances, violated clearly established Fourth Amendment law); *see and compare with Burke v. Sullivan*, 677 F.3d 367, 372 (8th Cir. 2012) (officers had specific information a potential victim was inside the home with the violent suspect, whose erratic behavior generated the domestic disturbance call).

[28]*See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963).

11

## 1. *Miranda*

Taking these claims in reverse order, because he was detained and questioned without any *Miranda* advisement, the real issue is whether Espinoza was in custody when he made his statements to Officer Hunger in the bedroom of the apartment. If so, then the statements must be suppressed; if not, they are admissible for all purposes as trial evidence.

The requirements of *Miranda* are triggered only when a suspect is both in custody and being interrogated.[29] "Custody occurs when [the] suspect is deprived of his freedom of action in any significant manner."[30] The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[31] "Two discrete inquiries are essential to [this] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he [ ] was at liberty to terminate the interrogation and leave."[32]   In making these inquiries, a court must "look at the totality of the

---

[29]*See United States v. Head,* 407 F.3d 925, 927 (8th Cir. 2005), *cert. denied,* 547 U.S. 1082 (2006).

[30]*United States v. Axsom,* 289 F.3d 496, 500 (8th Cir. 2002).

[31]*United States v. LeBrun,* 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting California v. Beheler,* 463 U.S. 1121, 1125 (1983) (*per curiam*)), *cert. denied,* 543 U.S. 1145 (2005).

[32]*J.D.B. v. North Carolina,* 131 S.Ct. 2394, 2402 (2011) (*quoting Thompson v. Keohane,*
(continued…)

circumstances while keeping in mind that the [custody] determination is based 'on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officer[ ] or the person being questioned.'"[33]

After due consideration of the circumstances present, the Court concludes that Espinoza was not in "custody" within the meaning of *Miranda*. A number of factors support this conclusion. The questioning occurred in his own bedroom and was of short duration, lasting less than five minutes. In speaking with Espinoza, Officer Hunger was engaged in on-the-scene fact finding, trying to get Espinoza's side of a domestic squabble and figure out what had transpired. At no time during the interview was Espinoza handcuffed or physically restrained and he was free to move about the room. He voluntarily acquiesced to questions, candidly making known that he had "got into it" with Peneaux. But he was adamant that she had attacked him and insisted that the officer take photographs of the scratch and bite marks he said she inflicted on him. The atmosphere was not police dominated – Officer Hunger largely being the only other person present – and there was no show of force. Significantly, Espinoza was not arrested until sometime later on (after the officer spoke to Peneaux for a while in the parking lot and investigated further).

---

516 U.S. 99, 112 (1995)).

[33]*LeBrun*, 363 F.3d at 720 (*quoting Stansbury v. California*, 511 U.S. 318, 322-23 (1994).

Granted, Espinoza was never informed he was free to leave and not under arrest. And he was eventually arrested and shackled after being questioned. But these facts are not dispositive. A court must consider all of the historical facts, not just the absence or marginal presence of certain judicially-created "indicia" that ostensibly tend to aggravate or mitigate the existence of custody. The essential inquiry must always be whether the suspect was "restrained as though he was under formal arrest."[34]

Espinoza's brief conversation with Officer Hunger did not become custodial when Espinoza admitted that he had an altercation with Peneaux. The officer's internal decision – after this admission – not to let Espinoza leave and to subsequently arrest him, did not transform the initial encounter into a custodial one. The officer did not say or provide any outward indication of what his thoughts or intentions were until he announced Espinoza was being arrested for the domestic abuse offense. The questioning likewise did not magically become custodial because of Espinoza's inculpatory remarks. Nothing in the environment or in the officer's treatment of

---

[34]*United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005); *see also United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005) (the factors in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to *Miranda* custody against those which detract"); *LeBrun*, 363 F.3d 719-24 (resolving the custody issue with nary a mention of *Griffin*).

Espinoza changed until the arrest was made. Custody must be determined by viewing the entirety of the situation through an objective, not a subjective, lens.[35]

Having studied the scene and reconstructed the events that night, the Court is satisfied that a reasonable person standing in Espinoza's shoes would not have understood he was in custody while briefly conversing with Officer Hunger in the "comforts" of his own bedroom.[36] Officer Hunger, thus, was not required to warn Espinoza of his Fifth Amendment privilege against self-incrimination and his right to the assistance of counsel, as required by *Miranda*, before communicating with him.

---

[35]*See Stansbury*, 511 U.S. at 323-25; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("although [the trooper] apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, [the trooper] never communicated his intention to respondent. The policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time; and the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *United States v. Harris*, 611 F.2d 170, 171-73 (6th Cir. 1979) (no custody requiring *Miranda* warnings where, despite agent's testimony that he would not have allowed defendant to leave the motel room, defendant was never informed of agent's intentions and never requested to leave).

[36]*See Beckwith v. United States*, 425 U.S. 341, 346-48 & n.7 (1976); *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014); *United States v. Huether*, 673 F.3d 789, 794-95 (8th Cir. 2012); *United States v. Perrin*, 659 F.3d 718, 720-21 (8th Cir. 2010); *see also Miranda*, 384 U.S. at 477-78 ("General on-the-scene questioning as to facts surrounding a crime or other questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.").

Inasmuch as the precepts of *Miranda* were adhered to, Espinoza's attempt to suppress his pre-arrest statements on *Miranda* grounds must fail.[37]

## 2. Poisonous Fruit

But Espinoza's alternative suppression claim – based on the statements being the poisonous fruit of a Fourth Amendment violation – is a different story. This claim has merit.

The exclusionary rule extends to both the direct and indirect products of an illegal search.[38] Where there has been a Fourth Amendment violation and the suspect has made a statement, that statement must not only meet the Fifth Amendment standard of voluntariness, but it also must be a free will act sufficient to purge the causative taint.[39] This is because "verbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."[40] Whether the statement was an act of free will depends on the time elapsed between the illegality and the statement, where (the place) the illegality occurred and the statement was made, the identity of the

---

[37]*See United States v. Circle Bear*, No. 3:14-CR-30122-RAL, 2015 WL 1969413 at **4-6 (D.S.D. May 1, 2015); *Aquallo*, 2014 WL 6812383 at **3-4.

[38]*See Wong Sun*, 371 U.S. at 484.

[39]*See Brown v. Illinois*, 422 U.S. 590, 601-02 (1975); *Wong Sun*, 371 U.S. at 486.

[40]*Wong Sun*, 371 U.S. at 485.

interrogators (whether the same or different ones were used), and the purpose and flagrancy involved in the illegality.[41]

In *Wong Sun*, federal agents illegally entered James Wah Toy's living quarters.[42] In a bedroom, they arrested and interrogated him.[43]  The Supreme Court held that his statements, made in the room, were the fruit of the Fourth Amendment violation and suppressed them.[44]

The same Court, however, reached a different conclusion as to the statements of Wong Sun.[45]  He, like Toy, was unlawfully arrested but after being arraigned and released on bond, returned voluntarily several days later and made a statement.[46]  The Court determined that his statement should not be suppressed because "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint' [of the initial illegality]."[47]

---

[41]*See Oregon v. Elstad*, 470 U.S. 298, 310 (1985); *Taylor v. Alabama*, 457 U.S. 687, 690 (1982); *Brown*, 422 U.S. at 603-04.

[42]*See* 371 U.S. at 474.

[43]*See id.*

[44]*See id.* at 484-86.

[45]*See id.* at 491.

[46]*See id.*

[47]*Id.* (*quoting Nardone v. United States*, 308 U.S. 338, 341 (1939)).

In Espinoza's case, there was no separation in time, place or identity of interrogators between the proscribed entry and his statements. Rather, the statements were made while the Fourth Amendment infringement was taking place. The interrogator (Officer Hunger) was the same officer who perpetrated the constitutional transgression. And he lacked probable cause to believe that an offense had been committed or was being committed and that Espinoza was the culprit.[48] What's more, there was no intervening advisement of rights under either *Miranda* or *Griffin*. *Wong Sun* and the exclusionary rule hence control and require that Espinoza's statements be suppressed as the toxic outgrowth of an illegal home "invasion."[49]

---

[48]*See United States v. Hernandez*, 670 F.3d 616, 620-23 (5th Cir. 2012); *In re K.H.*, 14 A.3d 1087, 1092-93 (D.C. App. 2011).

[49]*See Wong Sun*, 371 U.S. at 486; (Toy's statements to officers in his bedroom, made while he was detained and "closely consequent" to the unlawful entry into his home, were tainted and inadmissible); *see also Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (suspect's confession, after police entered his residence and detained him without probable cause, was not sufficient to purge the primary taint of the home invasion); *New York v. Harris*, 495 U.S. 14, 20 (1990) (under *Payton*, "a warrantless entry [into a home] will lead to the suppression of any evidence found, or statements taken, inside"); *United States v. Villa-Gonzales*, 623 F.3d 526, 535 (8th Cir. 2010) (suspect's telephonic statements, while being detained, which supplied the only basis for his arrest and led directly to his admission that he had entered the country illegally, suppressed under *Wong Sun* as the derivative fruit of a poisonous tree); *Lakoskey*, 462 F.3d at 975 (consent to search home ineffective when given immediately after illegal entry by officer); *United States v. Yousif*, 308 F.3d 820, 831 (8th Cir. 2002) (suspect's consent did not purge the taint of the Fourth Amendment violation where the consent was given close to, and on the heels of, the violation to the same officer who perpetrated the unconstitutional seizure in the same location); *United States v. Reinholz*, 245 F.3d 765, 779-80 (8th Cir.) (pre-*Miranda* statements made while suspect was handcuffed and seated in the back of unmarked patrol care were inadmissible; statements flowed directly from his unlawful detention

(continued...)

## C. Folding Knife

After the arrest, Officer Hunger searched Espinoza and seized a folding knife from his person. Espinoza claims that the knife is another fruit of the poisonous tree (an invalid entry and arrest under *Payton*) and is inadmissible. The Government contends that the exclusionary rule does not apply because the officers did not exploit the Fourth Amendment violation and obtained the knife by means sufficiently attenuated from the violation so as to purge it of any taint.

The Supreme Court has made it clear that "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."[50] Yet evidence obtained on this basis may still be admissible if "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality."[51]

Espinoza was searched, and a knife taken from his pants pocket, after a *Payton* trespass had occurred. The wrongful conduct was still fresh and flowing when Officer Hunger patted Espinoza down and commandeered the knife. And there were no intervening circumstances to vitiate the taint of the knife that stemmed from the Fourth

and no intervening event purged the taint of the illegality), *cert. denied,* 534 U.S. 933 (2001).

[50]*Harris,* 495 U.S. at 19.

[51]*United States v. Crews,* 445 U.S. 463, 470 (1980).

Amendment breach the officer put in motion. As a result, the taint of the violation was never purged, but remained, making the knife no different than the narcotics taken from Johnny Yee in *Wong Sun*.[52]

Aside from this, the Supreme Court in *Kirk v. Louisiana*[53] recently held that evidence seized during an in-home pat-down search of a suspect's person, conducted after a *Payton* violation, must be suppressed.[54] Just as in *Kirk*, the knife seized from Espinoza's person, during an in-home search incident to an arrest made in derogation of *Payton,* is the contaminated fruit of his arrest and is excludable.[55]

## D. Post-Arrest Statements

Espinoza lastly claims that his post-arrest statements, made to Agent Sedlmajer 32 hours later (none were made immediately after the arrest), were additional fruit of the same poisonous tree and should be suppressed. Should these statements, like the

---

[52]*See* 371 U.S. at 487-88; *see also* 6 Wayne R. LaFave, *Search and Seizure,* §11.4(d) at pp. 407-08 (5th ed. 2012) ("where the search of the person . . . has its only justification as being 'incident to' the arrest under *Chimel v. California* [395 U.S. 752 (1969)] then unquestionably the evidence found in the search must be suppressed if the antecedent arrest was in violation of the Fourth Amendment. This is direct rather than derivative evidence, and there is no occasion to be concerned about the limits of the fruit of the poisonous tree doctrine.").

[53]536 U.S. 635 (2002) (*per curiam*).

[54]*See id.* at 637-38 (2002).

[55]*Nora,* 765 F.3d at 1056 (citing to and recognizing that *Kirk* requires suppression of evidence seized from defendant's person where there has been a *Payton* violation in which the police have physically intruded into the home and conducted the pat-down search while still inside).

ones he made before his arrest, be excluded as well because they emanated from and were tainted by the earlier *Payton* infringement? The short answer is no.

"Where the police have probable cause to arrest a suspect, the exclusionary rule does not bar [ ] the use of a statement made by the [suspect] outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*."[56] Espinoza's arrest was made with probable cause (based in part on Peneaux's disclosures and the injuries observed to her face and neck) that was developed apart from the illegal entry and statements he initially gave. So his statements at the tribal jail were "not the product of being in unlawful custody" or the fruit of having been arrested in the apartment as opposed to another place.[57] The *Payton* requirement was "imposed to protect the home" and was fully vindicated by the suppression of "anything incriminating the [officers] gathered from arresting [him] in his [apartment], rather than elsewhere."[58] Because there was probable cause to arrest and question Espinoza when Officer Hunger went into the apartment the second time, Espinoza's subsequent jail house statements were not an exploitation of the officer's first – illegal – entry and are therefore not subject to attenuation analysis.[59]

---

[56]*Harris*, 495 U.S. at 21.

[57]*Id.* at 19.

[58]*Id.* at 20.

[59]*See id.* at 19.

Regardless, Espinoza's statements were enough of an act of free will to purge the

underlying taint. The length of time between the *Payton* violation and his statements at

the tribal jail – approximately 32 hours – weighs in favor of attenuation.[60] So too does

the fact that the interview was conducted at a different location (the jail as opposed to

Espinoza's apartment) and by a different officer (Agent Sedlmajer instead of Officer

Hunger).[61] Furthermore, it is undisputed that Espinoza was advised of and waived his

---

[60]*See United States v. Lopez-Garcia,* 565 F.3d 1306, 1315-16 (11th Cir.) (statements made the day after the arrest were too removed to have suffered any taint), *cert. denied,* 558 U.S. 1092 (2009); *United States v. Stark,* 499 F.3d 72, 76-77 (1st Cir. 2007) (voluntary confession admissible when made two days after allegedly illegal search to new officer, at different location even though defendant in police custody the entire time); *United States v. Jackson,* No. 97-2135, 1998 WL 964236 at **2-3 (6th Cir. Dec. 28, 1998) (24-hour time period between arrest and confession "argues in favor of admissibility"); *United States ex rel. Davis v. Loudin,* 89 F.Supp.2d 1007, 1010-11 (N.D. Ill. 1999) (31-hour time lapse between defendant's arrest and his confession weighs in favor of attenuation); *State v. Belton,* 150 N.H., 741, 747-50, 846 A.2d 526, 532-34 (statements made on the day after defendant's arrest reduced the possibility that they were the product of the illegal detention), *cert. denied,* 543 U.S. 1028 (2004); *Valentine v. State,* 688 So.2d. 313, 317 (Fla. 1996) (defendant's confession was deemed attenuated where it was given "nearly two days after the arrest"), *cert. denied,* 522 U.S. 830 (1997); *Cooks v. State,* 699 P.2d 653, 657 (Okla. Crim. App.) (two-day interval "is sufficient to dissipate the coercive nature of incarceration"), *cert. denied,* 474 U.S. 935 (1985); *see and compare with Brown,* 422 U.S. at 604 (statements separated from illegal arrest by less than two hours not attenuated); *Taylor,* 457 U.S. at 691 (confession six hours after illegal arrest not purged of the taint from the illegal arrest); *Dunaway v. New York,* 442 U.S. 200, 203 (1979) (incriminating statements made within an hour of an unlawful arrest not sufficiently attenuated); *but see United States v. Shetler,* 665 F.3d 1150, 1159 (9th Cir. 2011) (passage of 36 hours did not weaken the causal connection between the illegal search and defendant's statements).

[61]*See Missouri v. Seibert,* 542 U.S. 600, 615 (2004); *Elstad,* 470 U.S. at 310; *United States v. Vega-Rico,* 417 F.3d 976, 980 (8th Cir. 2005), *cert. denied,* 547 U.S. 1073 (2006); *United States v. Hernandez-Hernandez,* 384 F.3d 562, 566 (8th Cir. 2004); *see and compare*
(continued...)

22

*Miranda* rights.[62]  And the facts demonstrate that Officers Hunger and Young acted in good faith, in response to a call for help from a woman who said her life was being threatened, and that their law violations were not purposeful or flagrant.[63]

No evidence was presented that Officer Hunger used compulsion to elicit Espinoza's first set of statements, that the *Miranda* waiver Espinoza signed before making his second set of statements was not knowing, voluntary or intelligent or that his later statements were in any way coerced.[64]  Nor was Espinoza subjected to a two-step interrogation technique – one in which there is a subsequent administration of *Miranda* warnings to a suspect who previously provided a voluntary, but unwarned, statement – that was intended to circumvent *Miranda*.[65]

---

*with Reinholz*, 245 F.3d at 779-80 (affirming suppression of defendant's post-*Miranda* statements made on the heels of his illegal arrest and without any intervening circumstances to purge the taint of that arrest); *United States v. Carter*, 884 F.2d 368, 372-73 (8th Cir. 1989) (statement given after *Miranda* warnings suppressed as "fruit of the poisonous tree" where the interrogators were the same, there was no passage of time between the constitutional violation, *Miranda* warning and post-warning statements, all of which "occurred as a part of a continuous process").

[62]*See Brown*, 422 U.S. at 603; *United States v. Garreau*, 735 F.Supp.2d 1155, 1169 (D.S.D. 2010), *aff'd*, 658 F.3d 854 (8th Cir. 2011).

[63]*See United States v. Whisenton*, 765 F.3d 938, 942-43 (8th Cir. 2014); *United States v. Greer*, 607 F.3d 559, 564 (8th Cir.), *cert. denied*, 562 U.S. 989 (2010); *United States v. Herrera-Gonzales*, 474 F.3d 1105, 1113-14 (8th Cir. 2007); *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006); *United States v. Becker*, 333 F.3d 858, 862-63 (8th Cir. 2003); *see and compare with Brown*, 422 U.S. at 605.

[64]*See Garreau*, 735 F.Supp.2d at 1170.

[65]*See Bobby v. Dixon*, 132 S.Ct. 26, 31-32 (2011); *United States v. Elzahabi*, 557 F.3d
(continued…)

The statements Espinoza made at the jail were not invalidated by the earlier Fourth Amendment violation or by his pre-arrest statements in the apartment.[66] This being the case, his statements to Agent Sedlmajer need not be suppressed.

## CONCLUSION

Officers entered the apartment Espinoza was a resident of, arrested him and seized a knife from his person, without there being exigent circumstances to do so and without securing a warrant or consent. After the entry, but before his arrest, one of the officers questioned Espinoza and obtained incriminating statements from him. The actions of the officers collectively violated the Fourth Amendment and require suppression of Espinoza's pre-arrest statements and the knife under the fruit of the poisonous tree doctrine. But his post-arrest statements, made to another officer some 32

---

879, 884 (8th Cir.), *cert. denied*, 556 U.S. 1288 (2009); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007), *cert. denied*, 552 U.S. 1121 (2008); *Hernandez-Hernandez*, 384 F.3d at 566-67; *see and compare with Seibert*, 542 U.S. at 609-17, 20-22.

[66]*See Hudson v. Michigan*, 547 U.S. 586, 599-602 (2006) (*plurality opinion*); *Whisenton*, 765 F.3d at 941-43; *United States v. Riesselman*, 646 F.3d 1072, 1078-81 (8th Cir. 2011), *cert. denied*, 132 S.Ct. 1065 (2012); *United States v. Craig*, 630 F.3d 717, 722-23 (8th Cir. 2011); *Greer*, 607 F.3d at 563-64; *United States v. Walker*, 518 F.3d 983, 985-86 (8th Cir. 2008); *United States v. Villa-Velazquez*, 282 F.3d 553, 556 (8th Cir. 2002); *see also Wong Sun*, 371 U.S. at 491 (defendant's statement, made several days after his arrest and release on bond, was admissible because the "connection between the arrest and the statement had 'become so attenuated as to dissipate the taint'"); *Stoneman*, 2010 WL 1610065 at *3 (defendant's statements made at the jail were not the product of the illegal entry into his home because the arresting officer had probable cause to arrest defendant and thus he was not unlawfully in custody).

hours later at the tribal jail, were not the befouled offspring of a *Payton*/Fourth Amendment violation and are admissible as substantive evidence at trial.

## RECOMMENDATION

For the reasons and based on the authorities set forth in this report, it is hereby

RECOMMENDED that Espinoza's Motion to Suppress Evidence and Statements[67] be granted in part and denied in part.

## NOTICE

The parties have 14 calendar days after service of this report to file their objections to the same.[68] Unless an extension of time for cause is obtained,[69] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[70] Objections must "identify[] those issues on which further review is desired[.]"[71]

---

[67] *See* Dkt. No. 19.

[68] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[69] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[70] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[71] *Arn*, 474 U.S. at 155.

DATED this 24th day of November, 2015.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE